UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 17 CR 220 |
| v. | ) | |
| | ) | Honorable Matthew F. Kennelly |
| IESHA STANCIEL | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR.,
United States Attorney for the Northern District of Illinois, respectfully submits its
position paper as to the factors in sentencing. Defendant is a now 10-time convicted
felon who stands before this Court convicted of possessing a firearm that traveled in
interstate commerce. But this is no ordinary felon-in-possession of a firearm case.
Defendant is charged with, and convicted of, possessing an assault rifle and a 9 mm
pistol, both of which were stolen from a cargo shipment containing 33 firearms. But
FBI agents only approached defendant and found her to be in possession of the stolen
firearms after the following sequence of events. First, defendant was involved in
selling 10 stolen muzzle loader rifles to an FBI informant. When another individual
was charged in a federal indictment as a result of selling guns to that same informant,
defendant harassed and threatened the informant for being a "snitch." Agents, in fear
for the informant's life, obtained a warrant for defendant's arrest, which is when they
found her to be in possession of the stolen firearms. To account for the seriousness of
defendant's conduct, her significant criminal history, and the aggravating

1

circumstances surrounding her arrest, the government requests that the Court impose an above-Guidelines sentence of 86 months' imprisonment for the reasons articulated below. Such a sentence is sufficient, but not greater than necessary, to protect the public and to satisfy the other principles set forth in the Sentencing Guidelines and in 18 U.S.C. § 3553(a).

## I.    Factual Background

The recitation of facts begins with the offense conduct, since that is the crime of conviction and the focus of this memorandum. The memo then describes defendant's conduct leading up to the offense conduct, as that conduct constitutes an aggravating factor that the Court should consider in fashioning an appropriate sentence. Finally, this memo describes defendant's conduct in violating this Court's protective order, which is also a factor in aggravation.

### The Offense Conduct

On April 7, 2017, FBI agents obtained a warrant for defendant's arrest (probable cause for the warrant was based upon conduct that is further described below). Agents contacted defendant from her mother's telephone and inquired about her whereabouts, which defendant refused to provide before hanging up.

Agents then proceeded to a possible location for defendant at an apartment complex in Willowbrook, Illinois, where it was ultimately discovered that defendant lived with her co-defendant Cameron Battiste. At approximately 2:30 p.m., agents observed defendant standing inside the front door of the apartment building with

Battiste, when Battiste exited the building and walked outside. Battiste turned around, motioned for defendant to stay inside by lifting up a finger, and then walked towards a black Dodge SUV registered to defendant. Battiste entered the driver's seat of the SUV, started the vehicle, and reversed up to the front door of the apartment building he had just walked out of and where defendant was waiting.

Defendant then exited the apartment with a bag and walked towards the front passenger door of the SUV, at which point she was apprehended by agents. Defendant began to struggle and resist the agents, and, in the course of doing so, dropped the bag. From inside the bag agents recovered two firearms -- a Smith & Wesson M&P-15 Sport II assault rifle bearing serial number TE38718, which is a semiautomatic firearm capable of accepting a large capacity magazine, and a Smith & Wesson Model SDV9E 9mm pistol loaded with six live rounds and bearing serial number FYJ7552. Both firearms were part of a stolen cargo shipment containing 33 firearms. The train containing the cargo shipment of firearms had passed through Chicago in September of 2017.[1]

### B.    The Muzzle Loader Deal

Before defendant was arrested for possessing the two stolen firearms involved

---

[1] Incidentally, Defendant A was arrested in November of 2016 for selling CW firearms from the same cargo shipment. Although the government cannot set forth facts in this memorandum establishing that defendant provided the firearms to Defendant A which Defendant A ultimately sold to CW, it bears noting that: 1) a cargo shipment containing 33 firearms was stolen on or around September 17, 2016; 2) Defendant A sold three assault rifles stolen from that cargo shipment to CW on October 24, 2016; 3) defendant provided ten muzzle loader rifles to Defendant A which Defendant A then sold to CW on November 1, 2016; 4) the firearms defendant is convicted of possessing were stolen from the same cargo shipment.

in the present case, defendant trafficked ten stolen muzzle loader rifles on November 1, 2016. An FBI informant (CW) agreed to purchase the ten rifles from Defendant A for $5,000 (Defendant A is currently facing federal charges related to firearms trafficking, but which are unrelated to the ten rifles discussed here). During the consensually-recorded transaction, CW was waiting with Defendant A for an unknown individual to deliver the rifles. On the recording, a Nissan Maxima is seen arriving on scene, and Defendant A walks over to the Maxima to talk to the driver. While the driver cannot be seen on the video, several minutes later, outside the presence of Defendant A, CW says into the recording equipment, "[First name of agent handling the operation], I know who the source is [the individual providing the stolen firearms]. Pull up Iesha Stanciel. It's her boyfriend." Although agents investigating Defendant A and the firearms trafficking were not aware of who Stanciel was at the time of the transaction, agents were conducting surveillance and observe that the Maxima was driven by a black female wearing an orange shirt. Moreover, the Maxima was registered to Winfield Stanciel (defendant's father). The female (now identified as Stanciel) then drove the Maxima to Defendant A's garage, where an unidentified male unloaded five of the stolen rifles. Defendant then made a separate trip to pick up five additional rifles which were also dropped off at Defendant A's garage before being Defendant A delivered them to the CW. Not only is this conduct extremely serious in its own right, but defendant's fear that she would be arrested for firearms trafficking is likely why defendant attempted to intimidate and

harass CW after Defendant A's arrest, as described below.

## C. Defendant Intimidates the FBI Informant

On November 2, 2016, FBI agents arrested Defendant A. Several days later, defendant made the first of several threatening Facebook posts which served to threaten, harass, and intimidate CW. Defendant's first post was on CW's Facebook "wall" (viewable by anyone on the Facebook network who had access to CW's Facebook page). The post read: "Snitches get stitches and found in ditches" followed by 11 emojis of firearms.

Over the ensuing months, defendant made additional threatening posts which continued CW fear for his safety. On March 11, 2017, defendant made a post on her Facebook page stating, "[First and last name of CW] have been working with the Feds since 2004, 2005, 2007, 2010"… "Why this nig[***] ain't been found in a ditch[.]" Defendant further urged others to "Please Share" her post.

On April 4, 2017, defendant made two additional posts on her Facebook page pertaining to CW. The first read, "I'm speaking Facts, this ain't no rumor straight facts [100 emoji] I know some of y'all are going to be in shock, or disbelief. Word is this nig[***] [first and last name of CW] caught a retail thief case, and set up his 30 year nig[***] up with the Feds. This shit rite here hurt the heart[.]" The second post defendant made that day read as follows: "I don't understand how mutherfuc[***] want to be silent when it comes to a snitch, just sweep that shit under the rug like y'all do everything else that ever happened in y'all life[.]"

### D.    Defendant Violates the Court's Protective Order

Because the government was concerned for the CW's safety, it filed a motion for a protective order (Dkt. 22), which was granted by the Court (Dkt. 26). Pursuant to the Court's protective order governing discovery, certain materials – which, if disseminated, could be used to determine the identity of the CW – was marked as "sensitive" and could not be disclosed without notice to the government and without authorization from the Court.

According to a report filed by the Bureau of Prisons, on July 26, 2018, guards observed defendant's co-defendant, Cameron Battiste, hiding something under his shirt. Guards asked Battiste to show them what he was hiding, which was a stack of 26 compact discs – the discovery tendered in defendant's case. A guard asked Battiste why he was hiding the discs. According to the report, Battiste explained that he was hiding the discs because they were important and he did not want anyone to steal them. Battiste later stated, "inmate Stanciel was leaving to go to the penitentiary and she wanted me to mail them out for her. She left them in the library for me."

## II.    <u>Presentence Investigation Report</u>

The government has no objections or corrections to the Presentence Investigation Report, and agrees with the offense level, criminal history, and advisory Guidelines calculations contained within. The offense level, after accounting for defendant's acceptance of responsibility, is 19. PSR ¶ 27. Defendant's criminal history

6

is correctly calculated as falling into category VI. *Id.* ¶ 64. Therefore, defendant's advisory Guidelines range is 63-78 months of imprisonment. *Id.* ¶ 132.

## III. The Section 3553(A) Factors Support An Above-Guidelines Sentence

For the reasons stated below, and pursuant to 18 U.S.C. § 3553(a), the government asks the Court to sentence defendant to a sentence of 86 months, which is above the advisory guidelines range of 63-78 months' imprisonment. The serious conduct of the charged offense drives the advisory guidelines range, but in this case, the significant aggravating factors warrant a higher sentence. As set forth in the government's version of the offense, if the defendant's conduct in harassing the CW were considered to be relevant conduct and factored into defendant's guidelines calculation, her advisory guidelines range would be 77-96 months of imprisonment. The halfway point of those numbers is 86.5, which is why the government proposes a sentence of 86 months. This does not even take into account the following aggravating factors: 1) amazingly, defendant falls into Criminal History category VI even though **18** of her adult convictions accrue no criminal history points (PSR ¶¶ 37-54); 2) defendant's role in trafficking ten stolen muzzle loader rifles; and 3) defendant's violation of this Court's protective order. The government would be well justified in seeking an even higher sentence, but believes that a sentence of 86 months is necessary (and sufficient) to satisfy the goals of sentencing.

### A. Nature and Circumstances of the Offense

Defendant is a 10-time convicted felon who long ago forfeited the right to carry firearms. In this case, defendant not only possessed a firearm, but carried

7

two stolen firearms, one of which was an assault rifle. In a city reeling from violent shootings and homicides, this Court is well aware of the harms and dangers posed by convicted felons illegally possessing firearms.

**B.      History and Characteristics of Defendant**

Defendant's history and characteristics clearly warrant an above-guidelines sentence. Dating back to when defendant became an adult in 1998, she has been convicted of an offense, or in prison, for nearly every one of the past 20 years. At the time of the instant offense, defendant was on probation for two separate cases. This record shows an absolutely blatant disregard for the rule of law.

Moreover, in addition to the count of conviction, which in and of itself warrants a guidelines sentence of 63-78 months' imprisonment, the government's proposed sentence of 86 months is warranted because of defendant's other conduct and characteristics. Specifically, defendant was involved in the sale of ten stolen muzzle loader rifles. When defendant found out that Defendant A was arrested for his role in in selling firearms to CW, defendant, apparently in fear that she would be incriminated, began to threaten CW through Facebook. She orchestrated a spirited campaign to harm CW, imploring others to make sure that he "ended up in a ditch." Defendant's wish nearly came true. Although the government cannot prove, and does not suggest, that it is the result of defendant's actions, as set forth in the Government's Version of the Offense, CW was called a "snitch" and shot at. Although the shooter missed CW, CW's uncle who was present on the scene was

8

struck by gunfire. More recently, as reported by the Bureau of Prisons, defendant was apparently still trying to disseminate discovery that would expose CW as a "snitch" when she covertly passed her discovery discs to Battiste, in violation of this Court's protective order, so that he could "mail them out."

Defendant's significant criminal history, her conduct prior to the charged offense, and her post-arrest conduct in violating this Court's order, all weigh in favor of this Court imposing an above-guidelines sentence.

## C. The Need to Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public

An above-guidelines sentence of 86 months' imprisonment will promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public. This Court should send a message to members of the community that a ten-time convicted felon who illegally carries firearms will be severely punished. As the Seventh Circuit has recognized, offenses involving guns are especially serious: "Once the gun is in the defendant's hands he need only pull the trigger, an act which can be completed in a split second and which is controlled and influenced by nothing more than the defendant's whim." *United States v.* Matthews, 520 F.3d 806, 809 (7th Cir. 2008) (quoting *United States v.* Lane, 267 F.3d 715, 718 (7th Cir. 2001)). Moreover, in this case, the government has proffered and is prepared to present evidence that defendant is involved in trafficking firearms and threatening government informants. Such conduct is serious, puts lives in danger, and demands significant punishment.

9

IV.  **Conditions of Supervised Release**

The government agrees with the conditions of supervised release proposed by the Probation Department, and, especially in light of defendant's repeated violations of the law, believes that a three-year term of supervised release is appropriate. In light of the history and characteristics of Defendant, hwe offense conduct, and the purposes of sentencing as reflected in 18 U.S.C. §§ 3553 and 3583, the government respectfully requests that Defendant be required to comply with the following conditions of supervised release.[2]

A.  **Mandatory Conditions of Supervised Release**

The government agrees with the Probation Department that the following conditions should be imposed because they are mandated by Title 18, United States Code, Section 3583(d), and by Sentencing Guidelines Section 5D1.3(a):

1.  Defendant shall not commit another federal, state, or local crime.

2.  Defendant shall not unlawfully possess a controlled substance.

5.  Defendant shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

6.  Defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on probation and at least two periodic drug tests thereafter, up to 104 periodic tests for

---

[2] For ease of reference, the government's recommendations track the mandatory, discretionary, and special conditions of supervised release set forth in NDIL Form 245B – Judgment in a Criminal Case. *See* http://www.ilnd.uscourts.gov/OnlineForms.aspx.

use of a controlled substance during each year of supervised release.

**B.     Discretionary Conditions of Supervised Release**

The government agrees with the Probation Department that the following discretionary conditions should be imposed as a part of any term of supervised release imposed by the Court because these conditions support Defendant's rehabilitation, help reduce her risk of recidivism, provide her with needed medical care, and generally help her to successfully reintegrate into society:

1.     Defendant shall provide financial support to any dependents if financially able.

4.     Defendant shall seek, and work conscientiously, at lawful employment or pursue conscientiously a course of study or vocational training that will equip the defendant for employment.

6.     Defendant shall refrain from knowingly meeting or communicating with any person whom the defendant knows to be engaged, or planning to be engaged, in criminal activity.

7.     Defendant shall refrain from excessive use of alcohol, or any other controlled substance without a prescription by a licensed medical practitioner.

8.     Defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon.

9.     Defendant shall participate, at the direction of a probation officer, in a

11

substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year; in a mental health treatment program, which may include the use of prescriptions; and undergo medical testing to confirm diagnosis for sleep issues and other physical health ailments, and receive treatment.

The government agrees with the Probation Department that the following discretionary conditions should be imposed as a part of any term of supervised release imposed by the Court because these conditions help the Probation Department supervise Defendant, which in turn encourages Defendant's compliance with the law and deters her from committing future crimes. In particular, alternative condition #23 is recommended in light of defendant's conduct in using electronic devices to threaten, intimidate, and harass CW, as described above.

14. Defendant shall remain within the jurisdiction where the defendant is being supervised, unless granted permission to leave by the court or a probation officer.

15. Defendant shall report to a probation officer as directed by the court or a probation officer.

16. Defendant shall permit a probation officer to visit her at any reasonable time, including at home, at work, at school, at a community service location, or at any other reasonable location specified by a probation officer. In addition, Defendant shall permit confiscation of any

12

contraband observed in plain view of the probation officer.

17.    Defendant shall notify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer.

18.    Defendant shall notify a probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer.

22.    Defendant shall satisfy other special conditions as recommended below.

23.    Defendant shall submit her person, property, house, residence, vehicle, papers, computers, other electronic communications or data storage devices, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. Defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.  An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of her supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

## C.    Special Conditions of Supervised Release

The government agrees with the Probation Department that the following

special conditions should be imposed as a part of any term of supervised release imposed by the Court because these conditions support Defendant's rehabilitation, help reduce her risk of recidivism, and help her to successfully reintegrate into society.

2.       Defendant shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

3.       Defendant shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed, not to exceed 250 hours.

The government agrees with the Probation Department that the following special condition should be imposed as a part of any term of supervised release imposed by the Court because it assists the Probation Department in monitoring Defendant, and also makes Defendant less likely to recidivate:

11.     Defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court.

14

**Conclusion**

The goal of sentencing is to achieve a sentence that is "sufficient but not greater than necessary." The Sentencing Guidelines advise this Court to impose a sentence of between 63 and 78 months of imprisonment strictly with respect to defendant's conduct in illegally possessing a firearm. For all of the reasons articulated above – defendant's significant criminal history which is otherwise unaccounted for, her role in trafficking stolen rifles, her actions in threatening deadly harm to a government informant, and her violation of this Court's protective order governing discovery – an above-guidelines sentence of 86 months of imprisonment will be sufficient, but not greater than necessary, to comport with the principles of sentencing.

<div style="margin-left:40%">

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:   <u>/s/ Ankur Srivastava</u>
ANKUR SRIVASTAVA
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

</div>

Dated:   October 18, 2017